James J. Gravley v. Commissioner.
Gravley v. Commissioner
Docket No. 22234.
United States Tax Court
1950 Tax Ct. Memo LEXIS 100; 9 T.C.M. (CCH) 821; T.C.M. (RIA) 50226; September 15, 1950
*100 A partnership of husband and wife held formed for a valid business purpose and with a bona fide intent to act as partners where wife contributed capital but no services. The partnership earnings held taxable to the partners in accordance with their partnership agreement. Randall S. Jones, Esq., 917 Public Service Bldg., Portland 4, Ore., and Robert T. Jacob, Esq., for the petitioner. Douglas L. Barnes, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income and victory taxes for the calendar year 1943 in the amount of $45,882.39. The calendar year 1942 is also involved because of the Current Tax Payment Act of 1943. The issue which is determinative of all the assignments of error raised by petitioner is whether a valid business partnership is to be recognized as existing between petitioner and his wife during the years in question. This proceeding was submitted upon the pleadings, testimony, and stipulations of facts with incorporated exhibits. The stipulated facts have been summarized in material part in our findings of fact. Findings of Fact Petitioner is an individual, *101 residing and having his place of business in Portland, Oregon. His tax returns for the period here involved were filed with the collector of internal revenue for the district of Oregon. A notice of deficiency was mailed to petitioner from Seattle, Washington, on December 28, 1948. In 1917, petitioner organized the Alemite Lubricator Company of the Northwest. (The corporation's name was subsequently changed to the Alemite Company of the Northwest, and will hereinafter be referred to as Alemite.) The corporation served as the distributor for Stewart-Warner products and other similar products for a territory composed chiefly of the States of Washington and Oregon. It bought lubricating equipment and similar products directly from the factory, placed them in its inventory in its Portland warehouse and resold the products to approximately 200 jobbers in the Northwest who in turn redistributed to service stations, garages, industrial accounts, and similar consumers. Inventories for the business were maintained at levels as high as $150,000. Petitioner was the dominating figure in the business from its inception. The franchise from Stewart-Warner Corporation to handle the above products *102 was issued annually and was signed by petitioner. In 1927, petitioner organized the Jas. J. Gravley Company, Inc. (hereinafter referred to as Gravley, Inc.) This corporation was organized originally to handle merchandise other than the Stewart-Warner products. It discontinued its merchandising activities after approximately two years, purchased land in Seattle and built a building there that was used as a branch for the Alemite Corporation. Alemite leased this building from Gravley, Inc., for a rent varying from $200 to $350 per month. Petitioner and Virginia M. Gravley were married in 1927. In November, 1928, a home was purchased in Portland in their joint names. It was mortgaged when purchased in the amount of $13,500. The mortgage was paid off in subsequent years by petitioner. Virginia had furniture given to her by her mother which she desired to place in this home. Petitioner agreed to accept the furniture on the understanding that he would reimburse his wife subsequently by giving her an interest in his business. The furniture had an approximate value of $17,000. In 1928, petitioner gave his wife 96 shares of Gravley, Inc., these shares comprising all the outstanding stock *103 of the corporation except for qualifying shares. In 1930, Virginia loaned petitioner $3,500 and received a note therefor with interest at six per cent. Neither the note nor any interest thereon was ever paid. Petitioner was at all times the president of Gravley, Inc., and was the president of Alemite, holding all of the Alemite stock immediately prior to December 24, 1936. On the latter date, he transferred to his wife 100 shares of the 637.2 shares then issued and outstanding. He reported the transfer on a gift tax return. Between the years 1927 and 1936, petitioner withdrew from Alemite sums substantially in excess of his salary allowance as president of the corporation. As of December 31, 1936, the debit balance of his drawing account on the books of the corporation was in the amount of $63,279.33. The greater portion of these funds withdrawn in excess of salary was lost by petitioner in personal investments. Petitioner never intended at any time to repay any portion of this debit balance. Alemite and Gravley, Inc., were both Oregon corporations which were also registered to do business in the State of Washington. Because of the multiplicity of corporate reports required to *104 be filed with the States of Oregon and Washington as well as with the Federal Government, petitioner informed his counsel in December, 1936, that he had been delinquent on several of these reports and that as a result he desired to take steps to eliminate them. He was advised that he could operate the business either as an individual or as a partnership. As Gravley, Inc., was owned by his wife, petitioner discussed the alternatives with her. She favored forming a partnership. Petitioner warned her that if she came into partnership with him, she would be liable not only to the extent of the property which she contributed to it but also to the extent of her separate property, including her interest in a trust under her grandfather's will. Alemite and Gravley, Inc., were liquidated on December 31, 1936, and all of the assets of both corporations were taken over by the partnership. Petitioner reported a capital gain on the liquidation of Alemite in the amount of $63,800.24. Virginia reported a capital gain on the liquidation of Alemite and Gravley, Inc., in the amounts of $11,876.46 and $10,815.54, respectively. On December 31, 1936, petitioner and Virginia executed a written partnership *105 agreement providing for the operation of the business previously conducted by Alemite. Virginia's contribution to the partnership included all the assets of Gravley, Inc., in the amount of $10,815.54, her share (100/637.2) of the assets of Alemite in the amount of $17,745.74, and 100 shares of United Foundry stock valued at $2,100, or a total contribution of $30,661.28. Petitioner contributed to the partnership his share (537.2/637.2) of the assets of Alemite, which were placed on the partnership books at a value of $95,330.11. Included among these assets was petitioner's drawing account with the corporation. An assumed business name certificate for the Alemite Company of the Northwest, a partnership, was filed in the local recorder's office, March 31, 1937, and was signed by both petitioner and Virginia. Insurance policies on business property of the partnership named both partners as the assureds, and Virginia was shown as a partner on financial statements submitted by the partnership to banks and credit agencies. For the years 1937 and 1938, Virginia's drawing account in the partnership was closed into her investment account. Petitioner's drawings for the years 1937, 1938, and *106 1939 were allowed to accumulate and increased the debit balance of the drawing account taken over from the corporation from $63,279.33 as of January 1, 1937, to $93,690.47 on December 31, 1939. At the end of the calendar year 1937, profits for the year were allocated to the partners in proportion to their investment accounts appearing upon the partnership books, petitioner receiving 75 2/3 per cent of the profits and Virginia 24 1/3 per cent. A similar allocation of the profits was made for tax purposes. Profits for 1938 were reported on the 1937 percentage ratio for tax purposes but on the books the 1938 profits were divided in the ratio of the respective investment accounts of petitioner and Virginia. Petitioner was credited with.488 per cent of the profits and Virginia with.512 per cent of the profits. The ratios derived from the investment accounts were determined by the office manager of the partnership who kept the partnership books. In arriving at the 1938 allocation of profits, she deducted the amount of petitioner's drawing account from his investment account to determine his investment in the partnership. In 1940, petitioner and Virginia executed the following instrument *107 containing, inter alia, these provisions: "WHEREAS, on January 1st, 1937, the parties hereto formed the partnership of the ALEMITE COMPANY OF THE NORTHWEST and contributed thereto their respective assets, and "WHEREAS, the indebtedness of JAS. J. GRAVLEY in the amount of Sixty-three Thousand Two Hundred Seventy-nine and 33/100 Dollars ($63,279.33) was entered upon the accounts of the partnership at the full face value thereof, and "WHEREAS, the said JAS. J. GRAVLEY did not at that date nor at December 31, 1939, have assets outside of his partnership interest of a sum sufficient to liquidate said indebtedness or any substantial portion thereof, and "WHEREAS, additional charges accumulated against the drawing account of the said JAS. J. GRAVLEY up to and including December 31, 1939, and "WHEREAS, if the balance of said indebtedness had been charged to the capital account of the said JAS. J. GRAVLEY, such charge would have reflected a deficit therein, and "WHEREAS, the major portion of this indebtedness which thus accumulated over the years from 1927 to 1939 inclusive, represented withdrawals for the living and personal expenses of both of the parties hereto and their children, *108 and "WHEREAS, it is the desire of VIRGINIA M. GRAVLEY that the interest of the said JAS. J. GRAVLEY in the said partnership be not less than her own interest, and "WHEREAS, the said parties hereto agreed on December 31, 1939, that the said drawing accounts should be charged off and the capital accounts of the respective parties adjusted accordingly. "NOW, THEREFORE, I hereby make an ABSOLUTE gift of and set over to said JAS. J. GRAVLEY sufficient of my interest in said assets and the business of the ALEMITE COMPANY OF THE NORTHWEST, so that his interest therein will be Fifty-one percent (51%) of the whole, and my interest Forty-nine percent (49%) of the whole, and "IT IS MUTUALLY AGREED AND UNDERSTOOD by and between the parties hereto that the following agreements shall constitute their "ARTICLES OF PARTNERSHIP "I. "Said parties above named agree to carry on business under the name and style of "ALEMITE COMPANY OF THE NORTHWEST "II. "The partnership to which this agreement applies began on the 1st day of January, 1937, and shall continue for the duration of the joint lives of the partners. * * *
"V. "The capital of said partnership shall consist of the *109 assets of the ALEMITE COMPANY OF THE NORTHWEST, a corporation, and the assets of the JAS. J. GRAVLEY COMPANY, a corporation, as adjusted by sales and acquisition since said date, together with all the income and profits arising from the employment of said assets in the business conducted hereunder and not paid to the partners as drawings or a disbursement of profits and the interests of the respective partners hereto shall be as follows, dating from the 1st day of January, 1938: Jas. J. Gravley
51%
Virginia M. Gravley
49%
"VI. "The profits and losses of the partnership business shall be borne by the parties in the portions designated in the next preceding paragraph, to-wit: 51% and 49% respectively. "VII. "Each of the parties shall have an equal voice in the control of the business and operation of the partnership and each shall have the right and privilege to withdrawals from the said business to meet their respective needs. It shall be the duty of the partnership to keep accurate books of account, which shall be open at all reasonable times to the inspection and examination of each of the partners." * * *
An adjusting entry made on the partnership *110 books to reflect the above agreement resulted in a transfer in the amount of $3,469 from Virginia's investment account to petitioner's investment account. The drawing accounts of the partners were made joint as of January 1, 1940. Thereafter, irrespective of which partner withdrew funds during the year, at the close of the year the total drawings for petitioner and Virginia were closed into their individual investment accounts on the basis of 51 per cent of the drawings to petitioner and 49 per cent of the drawings to Virginia. Virginia used her drawing account with partnership to supply funds for household bills and for her personal expenditures. She had no limitation placed upon the amount that she could withdraw. She was kept informed by petitioner of the profits that were available. The following deposits were made by the bookkeeper to Virginia's personal bank account and charged to her partnership drawing account: 1937
$3,608.60
1938
1,900.00
1939
2,505.00
1940
4,360.00
1941
4,375.00
1942
4,875.00
1943
5,008.00
In addition to having funds deposited in her personal bank account, Virginia would also send some of the household bills to the bookkeeper *111 who would pay for them with a check of the partnership and charge such amounts against Virginia's drawing account. Neither petitioner nor Virginia used the partnership drawing account to acquire separate investments. All withdrawals were for the combined benefit of both partners. Except for these withdrawals for living expenses, all profits were left in the business as investments. Petitioner drew no salary in the partnership. Virginia performed no services of any kind for the business. Petitioner and Virginia intended to and did enter into a bona fide business partnership on December 31, 1936. This partnership was continued during the years 1942 and 1943. Opinion ARUNDELL, Judge: Viewing all the relevant evidence of this husband and wife partnership in a wholesale distributing business, we have educed no element of sham or lack of bona fides. When petitioner and his wife, Virginia, agreed to operate the Alemite Company as a partnership from January 1, 1937, they evinced a genuine intent to conduct the business as partners. Upon entering into the partnership, Virginia was fully cognizant of the risk of loss to which she subjected not only the capital which she contributed *112 to the partnership but also all her separately held property. Nearly one-half of the assets which she contributed consisted of property which had never been owned by her husband or property which he had given her more than eight years prior to the formation of the partnership. Moreover, in all the subsequent operations of the partnership. Virginia was accorded full public recognition of her status as a partner. We have reached the above conclusion notwithstanding the fact that Virginia, who testified that she was a housewife rather than a business woman, contributed no services to the partnership. Reality is not denied to a partnership where one of the partners supplies only capital and not services. : Particularly is this true where, as here, capital plays an important role in the production of income. "A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income, - capital or services." ; ; see also . Respondent *113 bottoms his attack on the validity of the partnership on the proposition that Virginia contributed no capital that originated with her. The origin of the capital contributed by the wife, however, is not decisive of her intent to become a partner. The determinative question is whether she possessed sufficient unfettered control over the capital which she put into the partnership so that the contribution was hers in actuality and not in name only. ; There is nothing in the evidence to indicate that Virginia did not have free disposition of the assets of Gravley, Inc., which she contributed to the partnership. It is also indisputable that the United Foundry stock which she placed at the disposition of the partnership was her sole and separate property previously purchased by her independent funds. The balance of her contribution represented her interest in the Alemite Corporation which she received as a gift from petitioner a week before the partnership agreement was executed. Had the Alemite assets been her sole contribution, we would then have to determine *114 whether petitioner's gift to her of 100 shares of Alemite was a mere paper transfer preparatory to the formation of a partnership or whether it was a genuine gift divesting him completely of all control over the shares. However, since the capital which Virginia put into the partnership was not limited to the Alemite assets, we may assume, without deciding, respondent's position that the gift of Alemite stock and the formation of the partnership were related and interdependent steps of a single transaction so that she never possessed any real control over this stock. Even thus discounting entirely Virginia's contribution of the Alemite assets, we find that her capital contribution was nevertheless substantial and justified her receipt of a share of partnership profits. Respondent has alternatively urged that, assuming the validity of the treatment of Virginia as a partner in the business, her proportionate share of the profits should be determined by and limited to the pro rata share of capital which she contributed to the partnership. We regard this argument as foreclosed by our decision in , where we said, at pages 287, 288: "Having concluded *115 that the partnership is valid for tax purposes, we do not concern ourselves with the sufficiency of the wives' contributions of capital or services to justify the shares of partnership earnings distributed to them. Any reallocation of partnership earnings among the partners contrary to that provided for in the partnership agreement would amount to the making of a new contract for the partners. That action is beyond the province of this Court, in the absence of any patently unreasonable agreement by them. ; ." The troublesome aspect of the present case lies in the manner in which petitioner and Virginia determined the disposition of partnership income after January 1, 1940. Prior to that date, each of the partners had separate drawing accounts from which each drew freely and at will. Virginia withdrew funds to pay for both household and personal expenses and at the end of the year the balance of her drawing account was charged against her investment account. After January 1, 1940, she continued her practice of drawing upon the partnership income for both household and personal *116 expenses except that her drawings were then charged to the joint drawing account with petitioner. At the end of the year, the total drawings of petitioner and his wife were deducted from their respective investment accounts on a 51-49 ratio regardless of the exact amounts which each withdrew. This unbusinesslike disposition of the income weakens petitioner's case for a genuine partnership. Were we not convinced from the other evidence that petitioner and his wife truly intended to become partners in the enterprise, the income disposition feature would cause us grave doubts about the partnership's validity. It is true that the testimony establishes that all withdrawals were for the combined benefit of both petitioner and his wife, that neither used their partnership drawing accounts to acquire separate investments, and that it should be expected that the accounting for profits in a husband and wife partnership will usually be less strict than in a partnership where the partners are unrelated. Nevertheless, the actual control of income and the purposes for which it is used are circumstances of prime importance in determining whether a family partnership is to be recognized as a valid *117 partnership tax-wise. We have weighed this factor with all the other evidence bearing upon the intent of petitioner and Virginia and from the totality have found the partnership to be a genuine one. Discussion of the alternative issues raised by petitioner is rendered unnecessary by our finding of a valid business partnership. Decision will be entered for the petitioner.